UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- x
LUIS ZENON,

                                               Plaintiff,

                       -against-

PATRICK D. DOWNEY, Correction Officer; ANTHONY
J. ANNUCCI, Acting Commissioner of the Department of
Corrections and Community Supervision; JOSEPH
BELLNIER, Deputy Commissioner, Correctional Facility
Operations; STEVEN RACETTE, Superintendent of
Clinton Correctional Facility; DONALD QUINN, First
Deputy Superintendent of Clinton Correctional Facility;
STEPHEN BROWN, Deputy Superintendent for Security
of Clinton Correctional Facility; CHRISTOPHER
MILLER, Superintendent of Great Meadow Correctional
Facility; MATTHEW THOMS, First Deputy
Superintendent of Great Meadow Correctional Facility;
RODNEY EASTMAN, Deputy Superintendent for Security
Great Meadow Correctional Facility; FRANCIS
SCARLOTTA, Seargeant Great Meadow Correctional
Facility; JOHN DOE Supervisor in Charge of the
Segregated Housing Unit at Great Meadow Correctional
Facility; JOHN DOE Decisionmaker to Place Clinton
Inmates in Great Meadow SHU; JOHN DOE Supervisors at
Clinton and Great Meadow Correctional Facilities ##1-25;
JOHN DOE State Troopers ##1-10; JOHN DOE Correction
Officers at Clinton and Great Meadow Correctional
Facilities ##1-50,

                                   Defendants.
----------------------------------------------------------------------- x

**MEMORANDUM OF LAW
IN OPPOSITION TO
DEFENDANTS' MOTION TO
DISMISS**

18-cv-458-LEK-ATB

Stoll, Glickman & Bellina, LLP
By: Leo Glickman
300 Cadman Plaza West, 12th FL
(718) 852-3710 (phone)
(718) 852-3586 (fax)
lglickman@stollglickman.com

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES…………………………………………………………………………  ii


POINT I

PLAINTIFF STATES A FOURTEENTH AMENDMENT PROCEDRUAL DUE
PROCESS CLAIM BECAUSE HE WAS SUBJECTED TO PUNITIVE
CONDITIONS ATYPICAL TO PRISON LIFE WITHOUT DUE PROCESS…………………. 1

    A.  PLAINTIFF POSSESSED A LIBERTY INTEREST TO NOT BE SUBJECTED
        TO ATYPICAL AND SIGNIFICANT HARDSHIP……………............................    1

    B.  PLAINTIFF WAS DEPRIVED OF HIS LIBERTY INTEREST
        DUE TO INSUFFICIENT PROCESS………………………………………………    4

POINT II

PLAINTIFF HAS PLED A PLAUSIBLE CLAIM FOR UNCONSTITUTIONAL CONDITIONS
OF CONFINEMENT BECAUSE HE WAS DENIED EVEN THE MINIMAL CIVILIZED
MEASURE OF LIFE'S NECESSITIES……………………………………………………..    5

    A.  PLAINTIFF'S CLAIM MEETS THE OBJECTIVE STANDARD BECAUSE THE
        DEPRIVATION THE INMATE SUFFERED WAS SUFFICIENTLY SERIOUS
        THAT HE WAS DENIED THE MINIMAL CIVILIZED MEASURE OF LIFE'S
        NECESSITIES……………………………………………………………………..    5

    B.  DEFENDANTS MILLER, THOMS, EASTMAN AND SCARLOTTA BECAUSE
        THEY ARE REQUIRED BY DOCCS TO PERFORM WEEKLY INSPECTIONS
        OF THE SHU AND THUS KNEW OF THE DEPRIVATION OR RECKLESSLY
        DISREGARDED THEM BY DISREGARDING DOCCS DIRECTIVES………..   7

POINT III

DEFENDANTS ARE LIABLE AS SUPERVISORS TO DEFENDANTS BECAUSE UNDER
THE EXTRAORDINARY CIRCUMSTANCES OF THE ESCAPE AND THE ALLEGATIONS
OF WIDESPREAD ALLEGATIONS OF SEVERE MISTREATMENT IN THE AFTERMATH,
THE SUPERVISORY DEFENDANTS WERE DELIBERATELY INDIFFERENT AND/OR
GROSSLY NEGLIGENT………………………………………………………………..…....   9

A.  SUPERINTENDENT RACETTE, FIRST DEPUTY SUPERINTENDENT QUINN, AND
    DEPUTY SUPERINTENDENT FOR SECURITY BROWN ARE LIABLE……………    9

B.  DEFENDANTS SUPERINTENDENT MILLER, FIRST DEPUTY SUPERINTENDENT THOMS, DEPUTY SUPERINTENDENT FOR SECURITY EASTMAN & SERGEANT SCARLOTTA ARE LIABLE…………………………………………………………………. 10

C.  DEFENDANTS ACTING COMMISSIONER ANNUCCI AND DEPUTY COMMISSIONER BELLNIER ARE LIABLE …………………………………………… 11


CONCLUSION……………………………………………………………….…………. 16

# TABLE OF AUTHORITIES

__Cases__                                                                                                 __Pages__


Alexander v. Cuomo,
  2018 WL 2041576, at 6 (N.D.N.Y., J. Sannes, 2018)……………………………………….……  9,15


A.T. by & through Tillman v. Harder,
  298 F. Supp. 3d 391, 412–13 (N.D.N.Y. 2018)……………………………………………………… 6


Carpenter v. Apple,
  2017 WL 3887908, at 11 (N.D.N.Y. 2017)……………………………….…………………… 11


Carter v. Carriero,
905 F. Supp. 99, 104 (W.D.N.Y. 1995)………………………………………………………….. 4


Colon v. Coughlin,
58 F.3d 865 (2d Cir. 1995)………………………………………………………………………….. 9


F.D.I.C. v. Loudermilk,
  984 F. Supp. 2d 1354, 1362 (N.D. Ga. 2013)………………………………….………………….. 14


Fed. Deposit Ins. Corp. v. Loudermilk,
761 S.E.2d 332 (2014)……………………………………………………………..…………… 14


Green v. Central Office Review Committee,
  2012 WL 1191596………………………………………………………………………………….. 4


Groves v. Davis,
2014 WL 4684998, at 14 (N.D.N.Y., 2014)……………………………………………….………… 11


F.D.I.C. v. Loudermilk,
  984 F. Supp. 2d 1354, 1362 (N.D. Ga. 2013)…………………………………………………….. 14


J.S. v. T'Kach,
714 F.3d 99 at 106 (2d Cir. 2013)…………………………………………………………………… 5


LaBounty v. Coombe,
  2001 WL 1658245, at 5 (S.D.N.Y. 2001)…………………………………………………….….. 3


Ortiz v. McBride,
380 F.3d 649, 654 (2d Cir.2004)……………………………………………………………..…… 1


Palmer v. Richards,

364 F.3d 60, 64 (2d Cir. 2004)……………………………………………………………… 2

Pasternack v. Lab. Corp. of Am.,
892 F. Supp. 2d 540, 552 (S.D.N.Y. 2012)………………………………...…………..... 13

Raspardo v. Carlone,
770 F.3d 97, 116 (2d Cir. 2014)……………………………………………………………11

Sealey v. Gitmer,
197 F.3d 578 (2d Cir. 1999)………………………………………………………………… 2

Smith v. Hamilton,
2016 WL 3823395, at 3 (N.D.N.Y. 2016)…………………...……………………………… 5

Thornburgh v. Abbott,
 490 U.S. 401, 409, 413 (1989)……………………………………………………………… 7

Walker v. Schult,
717 F.3d 119, 125 (2d Cir. 2013)………………………………………………………… 5

Williams v. Ramos,
2013 WL 7017674, at 4 (S.D.N.Y. 2013)……………………………...…………………………… 6

Woodward v. Corr. Med. Servs. of Illinois, Inc.,
368 F.3d 917, 930 (7th Cir. 2004)………………………………………….…………………… 14

Statues                                                                                          Page

N.Y. Correct. Law § 18(1)………………………………………………………………… 10
N.Y. Correct. Law § 18(2)………………………………………………………………… 10
N.Y. Correct. Law § 18(3)………………………………………………………………… 10

## POINT I

## PLAINTIFF STATES A FOURTEENTH AMENDMENT PROCEDRUAL DUE PROCESS CLAIM BECAUSE HE WAS SUBJECTED TO PUNITIVE CONDITIONS ATYPICAL TO PRISON LIFE WITHOUT DUE PROCESS

"[T]o present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." Ortiz v. McBride, 380 F.3d 649, 654 (2d Cir.2004).

### A.  PLAINTIFF POSSESSED A LIBERTY INTEREST TO NOT BE SUBJECTED TO ATYPICAL AND SIGNIFICANT HARDSHIP

Plaintiff alleges the atypical and significant hardship he endured during his confinement in the Great Meadow C.F. Segregated Housing Unit ("SHU") in paragraphs 40-51 of the complaint.  He was punched numerous times in the stomach while being escorted to the SHU for no legitimate penological purpose and was thrown into his SHU cell.  The message was clear, life in Great Meadow's SHU was going to be a hell for him.

Thereafter, for the 31 days he spent there, he was denied any phone calls to family or anyone in the outside world.  When his wife found out he was there, she called the facility.  He was threatened with bodily harm because his wife tried to find out about his welfare.  He could not write letters to anyone.  He was denied paper and writing instruments.  He could not grieve or otherwise challenge his confinement.  For 31 days he was held incommunicado, unable to contact anyone outside the prison or to receive communications.

Furthermore, he was denied the one hour per day of exercise and recreation outside of his cell all SHU inmates are entitled to.  And though he was permitted to shower every few days, the conditions in the showers were filthy.  In addition, he was permitted no change of clothes and no personal items.

1

Courts look to the duration of time an inmate is held in confinement, the severity of the

conditions and its "atypicality" from normal prison life to determine whether prong one of the

test is satisfied. Palmer v. Richards, 364 F.3d 60, 64 (2d Cir. 2004).  For an inmate held for more

than 300 days in punitive housing, the plaintiff need not demonstrate any atypical hardship, only

that he was denied access to due process. Id. For between approximately 100 to 300 days, a

plaintiff needs to show that the conditions in excess of the standards set forth in Sealey v. Gitmer

197 F.3d 578 (2d Cir. 1999) to meet prong one.  Palmer at 64.  In Palmer, the plaintiff's atypical

and significant hardship being claimed was as follows:

> The atypical and significant hardship this plaintiff suffered due to
> his wrongful confinement in S.H.U. was being deprived his
> property, [i.e.,] personal clothing, grooming equipment, hyg[i]enic
> products and materials, reading materials, writing materials, school
> books, personal food and vitamin supplements, family pictures as
> well as personal correspondences, being mechanically restrained
> whenever this plaintiff was escorted, and being out of
> communication from his family, were the hardships that this
> plaintiff suffered while in S.H.U.  This affidavit, which has not
> been contradicted, raises genuine questions of material fact as to
> the conditions under which Palmer was confined and how those
> conditions compared to the conditions imposed on the general
> prison population.

Id.

Clearly, the plaintiff suffered most of these, plus additional deprivations.  Being restricted

from any exercise outside his cell or recreation for 31 days, being denied correspondence with

loved ones or lawyers, and being denied a change of clothing, in addition to the same

deprivations as the plaintiff in Palmer, clearly meets the requirements of prong one.  Moreover,

plaintiff was assaulted with impunity upon being placed in these conditions.  The psychological

fear and distress placed on plaintiff when he was assaulted as he was transported to the SHU, and

cut off from all communications or the ability to grieve can only be described as psychological

torture.

Moreover, these deprivations represent a marked negative departure from the already severely restrictive conditions of the Great Meadow SHU.  Moreover, denial of writing materials and books are also atypical even for inmates being held in SHU.  LaBounty v. Coombe, 2001 WL 1658245, at 5 (S.D.N.Y. 2001).  In addition, the withholding of his personal items, and his denial of other personal hygiene products represented an atypical incident of prison conditions that entitled him to due process.  Attached as Exhibit "A" is DOCCS Directive 4933.  Section 302.1 of the directive lists the items that a SHU detainee is entitled to.  The directive specifies that a SHU detainee must have more than one set of clothing §302.1(a), writing materials §302.1(d), and personal items including reading material §302.1(f), all of which was denied to him the entire 31 days in SHU.

Finally, plaintiff was denied access to at least one telephone call, which he was entitled to under Directive 4933.  Defendants cite to 7 NYCRR §301.7 to support their notion that DOCCS may simply place an inmate in SHU for any reason and thus being placed in SHU entitles you to no right to due process.  Of course, that cannot be so.  Tellingly, they ignore 7 NYCRR §301.7(b) which states that a prisoner who enters SHU under §301.7(a) enter as a level II "PIMS" prisoner and is entitled to certain privileges that others are not.[1]  In addition to the enumerated personal items, a level II PIMS designation entitles a SHU detainee to one telephone call.  Plaintiff desperately wanted to place a phone call to speak to a loved one, tell her where he was and explain what was happening.  Such a contact with the outside world would have certainly eased the extreme stress and mental anguish he was suffering, but he was denied even this small freedom that he was entitled to under DOCCS' own rules.

---

[1] The rules and regulations pertaining to segregated housing units that are cited above are included in DOCCS Directive 4933, attached herewith at Exhibit "A".

3

Defendants' reliance on <u>Green v. Central Office Review Committee</u>, 2012 WL 1191596 is misplaced. They quote the court as follows: "Restrictions on telephone use, recreational activities, access to law libraries, visitation, personal property, educational and employment opportunities generally apply to all inmates confined to SHU regardless of the reason that they have been placed there."  Def't Memorandum of Law page 5.  This parenthetical quote is pulled from another case <u>Carter v. Carriero</u>, 905 F. Supp. 99, 104 (W.D.N.Y. 1995).  In both cases, the plaintiffs were claiming merely that the normal restrictions of SHU confinement were atypical and posed a significant hardship.  Here, plaintiff alleges that he was being held under conditions that negatively departed from DOCCS own directive.  Furthermore, each of the plaintiffs in the cases cited by defendants were complaining of mere "restrictions" on telephone use, access to law libraries and recreation.  Plaintiff has pled the total deprivation of rights that the courts and DOCCS itself through its rules confers on SHU inmates.

The atypical and significant hardships plaintiff was forced to endure amount to a deprivation of a liberty interest sufficient to satisfy prong one of the procedural due process test.

B.  <u>PLAINTIFF WAS DEPRIVED OF HIS LIBERTY INTEREST DUE TO INSUFFICIENT PROCESS</u>

Defendants do not dispute that plaintiff did not have access to any legal due process mechanism to challenge his confinement in SHU.  Rather, they claim that an inmate can be put in SHU "for any reason."  They seem to argue that if you are put in punitive housing as an inmate because you commit some prison infraction such as fighting, you are entitled to due process. But if you are arbitrarily placed in such housing for *any other reason*, (emphasis in defendants' memo of law) then you must endure it at the whim and pleasure of a deputy commissioner.  This clearly is not the case.  "A prisoner has a liberty interest that is implicated by SHU confinement if it imposes an atypical and significant hardship on the inmate in relation

to the ordinary incidents of prison life." <u>Smith v. Hamilton</u>, 2016 WL 3823395, at 3 (N.D.N.Y. 2016) *quoting* <u>J.S. v. T'Kach</u>, 714 F.3d 99 at 106 (2d Cir. 2013).

Since plaintiff has plausibly pled that his SHU confinement was an atypical and significant hardship and further that he received no due process, his due process rights were violated.  We respectfully submit that the motion to dismiss the claim must be denied.

## POINT II

## <u>PLAINTIFF HAS PLED A PLAUSIBLE CLAIM FOR UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT BECAUSE HE WAS DENIED EVEN THE MINIMAL CIVILIZED MEASURE OF LIFE'S NECESSITIES</u>

Plaintiff did not file this lawsuit to complain that he was uncomfortable at Great Meadows C.F.  He is fully aware, as defendants point out, that the constitution does not "mandate comfortable prisons."  Def't Memo of Law page 9.  However, the Second Circuit has made clear that the conditions of confinement may not "involve the wanton and unnecessary infliction of pain."  <u>Walker v. Schult</u>, 717 F.3d 119, 125 (2d Cir. 2013).

To state an Eighth Amendment claim based on conditions of confinement, an inmate must allege that: (1) objectively, the deprivation the inmate suffered was "sufficiently serious that he was denied the minimal civilized measure of life's necessities," and (2) subjectively, the defendant official acted with "a sufficiently culpable state of mind ..., such as deliberate indifference to inmate health or safety."  <u>Walker v. Schult</u>, 717 F.3d 119, 125 (2d Cir. 2013).

A.  P<span style="font-variant:small-caps">LAINTIFF'S CLAIM MEETS THE OBJECTIVE STANDARD BECAUSE THE DEPRIVATION THE INMATE SUFFERED WAS SUFFICIENTLY SERIOUS THAT HE WAS DENIED THE MINIMAL CIVILIZED MEASURE OF LIFE'S NECESSITIES.</span>

In establishing a conditions of confinement claim, the plaintiff may rely on one particular condition or a combination of conditions to show that they were sufficiently serious. <u>A.T. by &</u>

5

through Tillman v. Harder, 298 F. Supp. 3d 391, 412–13 (N.D.N.Y. 2018) *quoting* Walker at 125.  There is no 'static test' to determine whether a deprivation is sufficiently serious. Id. at 413.  In A.T. by & through Tillman, the conditions generally caused psychological, not physical, injuries.  Id.

Upon his arrival at the Great Meadow SHU, plaintiff was greeted with a beating by guards.  He was then thrown into his cell, suggesting his well-being meant little or nothing. Indeed, they reinforced this by telling him that he's not going to like what happens to him if his wife calls the facility again.  Compl. ¶41.  Just before arriving, like other of his fellow honor block inmates, he was beaten and tortured. Specifically, plaintiff was strangled by DOCCS employees who showed no regard for his life. Compl. ¶¶32-34.  It was impossible for DOCCS employees not to know the basic details about the escape and the escapees.  Clinton Honor Block inmates were suspects, and they were vulnerable.

It is in this context, that the denial of outside communications must be viewed in.  He could not write down what was happening to him. He could not send a letter. He could not make or receive a phone call.  He could not receive a visitor.  The other deprivations suffered that were in violation of DOCCS rules for inmates there for disciplinary reasons, the filthy shower, the denial of personal belongings, the denial of a change of clothes and the restriction from even one hour of recreation or exercise served to reinforce his reasonable perception that his life meant nothing and that he was being held incommunicado so that they were free to treat him as inhumanely as they wished.

Defendants are correct that "prisoners enjoy no "absolute right to make telephone calls, and prison regulations may reasonably restrict mail ... between inmates and outsiders."  Williams v. Ramos, 2013 WL 7017674, at 4 (S.D.N.Y. 2013).  But under these conditions, the restriction

was far more serious to the safety and health of the plaintiff.  Moreover, such [r]estrictions on prisoner communications, like those regarding visitation, are valid if "reasonably related to legitimate penological interests." Id. *citing* Thornburgh v. Abbott, 490 U.S. 401, 409, 413 (1989).

Defendants analyze each of the deprivations in isolation.  But they amounted to an aggregation of deprivations that must be contextualized; they did not occur in a vacuum.  In context, these deprivations were "sufficiently serious" to state a plausible conditions of confinement claim.  Furthermore, the fact that defendants have not put forward any purpose to these deprivations that are reasonably related to legitimate penological interests, and such purpose has not been tested in discovery to determine its "reasonableness" or whether it can be disputed, dismissal on the pleadings would be inappropriate.

For these reasons, we respectfully submit that plaintiff has plausibly pled the objective prong for a conditions of confinement claim.

B. DEFENDANTS MILLER, THOMS, EASTMAN AND SCARLOTTA BECAUSE THEY ARE *REQUIRED* BY DOCCS TO PERFORM WEEKLY INSPECTIONS OF THE SHU AND THUS KNEW OF THE DEPRIVATION OR RECKLESSLY DISREGARDED THEM BY DISREGARDING DOCCS DIRECTIVES.

Defendants claim that plaintiff did not allege that the Moving Defendants knew of and recklessly disregarded an excessive risk to health and safety.  It is true that plaintiff did not use those words, however, there is no "magic words" requirement for complaints.  Plaintiff pled that these defendants subjected him to repugnant conditions with "malicious intent, purposefulness and/or deliberate indifference." Compl. ¶¶69-73.

Furthermore, the Complaint alleges that Sergeant Scarlotta was the person responsible for supervision of the Great Meadow SHU during plaintiff's custody there.  Compl. ¶22.  As a Unit Supervisor of the SHU, he is required to be present in the SHU "at a minimum" when "inmates

are admitted into the SHU", "removed from a cell", or when an inmate is escorted to activities. DOCCS Directive 4933, Appendix, Section II(A) 1-4.  (Attached as Exhibit A.)  He obviously would know of the conditions in which he and the other inmates were being confined, or certainly should have known.

Defendants Superintendent Miller, First Deputy Superintendent Thoms, and the Deputy Superintendent for Security Rodney Eastman, as the three highest ranking employees at Great Meadow CF, were members of the facility's Executive Team.  The Superintendent along with each member of the Executive Team is obligated under DOCCS own Directive 4933 to visit the Segregated Housing Unit ("SHU") once per week.  DOCCS Directive 4933, Appendix, Section II(D) (attached as Exhibit A).  Therefore, these defendants showed, at the very least, a reckless disregard to plaintiff by either 1) complying with their obligations under this Directive and simply ignoring the deplorable conditions that the Clinton Honor Block inmates were forced to endure in the SHU, or 2) Disregarding their obligations under this Directive at such a critical moment for DOCCS.  In either case, to use the standard set forth by defendants, they were either "subjectively aware of his actual conditions, knew of an excessive risk to his health or safety, or consciously disregarded same."  Def't Memo of Law page 11.

Plaintiff's allegations meet the objective and subjective standards required to state a claim for unconstitutional conditions of confinement and thus we respectfully submit defendants' motion must fail.

8

## POINT III

## DEFENDANTS ARE LIABLE AS SUPERVISORS TO DEFENDANTS BECAUSE UNDER THE EXTRAORDINARY CIRCUMSTANCES OF THE ESCAPE AND THE ALLEGATIONS OF WIDESPREAD ALLEGATIONS OF SEVERE MISTREATMENT IN THE AFTERMATH, THE SUPERVISORY DEFENDANTS WERE DELIBERATELY INDIFFERENT AND/OR GROSSLY NEGLIGENT

Colon v. Coughlin, 58 F.3d 865 (2d Cir. 1995) is the law of this Circuit on Supervisory

Liability.  It provides the five following bases on which supervisory liability may lie:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

A. SUPERINTENDENT RACETTE, FIRST DEPUTY SUPERINTENDENT QUINN, AND DEPUTY SUPERINTENDENT FOR SECURITY BROWN ARE LIABLE.

1. Defendant Racette

In another case in which a Clinton Honor Block inmate was assaulted on June 6, 2015 by

strangulation, Judge Sannes of this court ruled: "Given the unusual circumstances following this

escape and the widespread allegations of beatings and similar conduct, the Complaint plausibly

alleges that Defendant Racette had reason to know of the violations and was grossly negligent or

deliberately indifferent in failing to prevent them."  Alexander v. Cuomo, 2018 WL 2041576, at

6 (N.D.N.Y., J. Sannes, 2018).

In a deposition taken on October 25, 2017, Superintendent Racette testified that from June 6, 2015 on he continued to be responsible for inside Clinton C.F.  He further said "part of what I did is I walked – continued to make rounds. I walked every gallery. I looked at every inmate.  I asked them if they were okay.  And I didn't get a single complaint of assault in any of those rounds."  Exhibit B 57:22 – 58:13.

The title of superintendent of New York State correctional facilities is created by statute. N.Y. Correct. Law § 18(2) provides that superintendents "…shall have the supervision and management" of the correctional facility to which he is appointed.  The law further provides that "the superintendent of a correctional facility shall direct the work and define the duties of all officers and subordinates of the facility."   N.Y. Correct. Law § 18(3). The superintendent is appointed by the Commissioner.  N.Y. Correct. Law § 18(1).  Clearly, Clinton C.F. was the responsibility of Superintendent Racette at the time of the escape and its aftermath.  He was statutorily required to supervise and manage the facility and direct the work of officers and subordinates.

The Complaint lays out the extraordinary nature of the escape and abuses that took place immediately afterward.  It alleges a course of conduct undertaken by Clinton officials and circumstances that are so widespread in such a confined environment in such a short period of time that it is simply impossible to claim a lack of knowledge for what was going on. *See e.g.* Compl ¶¶ 6,7, 28-34, 79-87.  The Complaint specifically alleges at ¶81 that literally "…dozens of inmates were brutally interrogated, beaten and tortured by prison guards in an attempt at retribution and cover up" after the escape, and cites to press reports and other complaints filed related to the June 6, 2015 assaults to corroborate the claim.

Superintendent Racette is free to deny that inmates were beaten.  What plaintiff

10

respectfully submits to the court is that he cannot successfully claim that if this pervasive and systematic violence was occurring inside his prison at an extremely high profile time in the history of Clinton C.F., he is not responsible.

At the very least, based on the specific and plausible allegations made in the Complaint, Racette is liable to plaintiff as a supervisor for being "grossly negligent" in supervising his officers and subordinates at such an extraordinary time in the prison. Gross negligence "is the kind of conduct where the defendant has reason to know of facts creating a high degree of risk of harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk." Raspardo v. Carlone, 770 F.3d 97, 116 (2d Cir. 2014). *See also* Carpenter v. Apple, 2017 WL 3887908, at 11 (N.D.N.Y. 2017). Clearly here, Superintendent Racette had "reason to know of facts", to wit, the pervasiveness and scale of the alleged beatings and torture of dozens of honor block inmates immediately after the high-profile escape. Indifference, if not conscious disregard, can easily be deduced from the fact that this scope of brutality occurred and continued without interruption from Superintendent Racette, whose duty it was to stop it. "A supervisor can be held liable when he or she has actual or constructive notice of unconstitutional practices, but similarly acted with gross negligence or deliberate indifference in failing to act." Groves v. Davis, 2014 WL 4684998, at 14 (N.D.N.Y., 2014).

In addition, Colon's third basis for supervisory liability, that Racette "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom" also supports plaintiff's claim of supervisory liability. Of course, the escape itself was a unique event at Clinton C.F. The policy that emerged in response to the escape may not have been a long-standing one due to the unlikely nature of the event, but it was a policy nonetheless. Specifically, given the pervasiveness of the alleged brutality, the likelihood that

11

honor block inmates who lived 24 hours a day in close proximity to the two honor block

escapees would have information about their whereabouts, the pressure to capture them, and the

fact the brutality occurred and continued to occur without supervisor interference, is indicative of

a policy to use brutality to extract information from the inmates with regard to the escape.  It

may not have been a written policy, but it was in fact a policy that developed in quick response

to the escape and the need to capture the escapees.  The prison was Racette's statutory

responsibility.  He at the very least allowed the unconstitutional policy of using excessive force

to extract information to occur and continue under his watch.

      2. <u>Defendants Brown and Quinn</u>

Defendant Brown was the Deputy Superintendent of Security.   Clinton Correctional

Facility, like most facilities in New York, has the Deputy Superintendents: One for security, one

for programs and one for administration.  Clearly, by the title alone, defendant Brown's primary

responsibility was for security at the prison.  That was his job.  Given the extraordinary

circumstances of the escape and its immediate aftermath, it is at least gross negligence and likely

deliberate indifference in failing to prevent the assaults.

Defendant Quinn was the First Deputy Superintendent, the second in command of the

facility after Superintendent Racette himself.  He too would have demonstrated gross negligence

or deliberate indifference to plaintiff's safety if the allegations in the Complaint are proven true.

Furthermore, it is noteworthy that the three supervisory officials that were suspended

later in the month because of the escape were Quinn, Brown and Racette, demonstrating that

state officials understand that they are responsible for security at the prison.

12

B.  D<span>EFENDANTS</span> S<span>UPERINTENDENT</span> M<span>ILLER</span>, F<span>IRST</span> D<span>EPUTY</span> S<span>UPERINTENDENT</span> T<span>HOMS</span>, D<span>EPUTY</span> S<span>UPERINTENDENT FOR</span> S<span>ECURITY</span> E<span>ASTMAN</span> & S<span>ERGEANT</span> S<span>CARLOTTA ARE LIABLE</span>

As discussed in Point IB *supra* the conditions that were suffered by plaintiff were not only obviously unconstitutionally inhumane, they negatively departed from the minimum standards set by DOCCS Directive 4933.  In addition, as stated in Point IIB *supra* each of these defendants had obligations under DOCCS' own directives to inspect the SHU at Great Meadow while plaintiff was detained there to ensure compliance.  By seeing the conditions alleged by plaintiff at SHU which were inhumane and in violation of DOCCS rules and doing nothing, or by disregarding DOCCS' rules and not doing the required rounds of the SHU, these defendants demonstrate deliberate indifference or gross negligence.

"A plaintiff must establish three elements to prevail on a negligence claim: (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.  To prevail on a gross negligence claim, plaintiff must establish each of these three elements and offer evidence that the defendant's conduct evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing."  <span>Pasternack v. Lab. Corp. of Am.</span>, 892 F. Supp. 2d 540, 552 (S.D.N.Y. 2012).  [*Internal citations and quotations omitted.*]  "To constitute gross negligence, the act or omission must be of an aggravated character, as distinguished from the failure to exercise ordinary care."  <span>Metro.  W. Asset Mgmt., LLC v. Magnus Funding, Ltd</span>., 2004 WL 1444868, at 9 (S.D.N.Y. 2004).  Clearly here, these defendants owed a duty to plaintiff as custodians of the prison tasked with the safety and security of everyone inside.  They breached the duty by visiting the SHU and ignoring the deplorable conditions the Clinton inmates were kept in, or by simply not bothering to inspect.  Clearly, such indifferent supervision was a cause of plaintiff's injury.

Furthermore, whether the conditions alleged in the complaint were known and ignored by defendants Miller, Thoms, Eastman and Scarlotta, or they were unknown because they disregarded their duties under Directive 4933, these defendants are liable at least for gross negligence. Allegations of disregard of procedures are sufficient for a jury to conclude that a defendant was grossly negligent.  F.D.I.C. v. Loudermilk, 984 F. Supp. 2d 1354, 1362 (N.D. Ga. 2013), *certified question answered sub nom.* Fed. Deposit Ins. Corp. v. Loudermilk, 761 S.E.2d 332 (2014).  Employees disregard for policies and procedures can support a finding of callous disregard for the safety of inmates resulting in punitive damages being assessed.  Woodward v. Corr. Med. Servs. of Illinois, Inc., 368 F.3d 917, 930 (7th Cir. 2004).

Plaintiff respectfully submits that if these defendants performed their required inspections and did not remediate the conditions, they were deliberately indifferent and/or grossly negligent. Furthermore, if the defendants did not actually know of the conditions in the SHU because they disregarded their duties, a jury should decide whether such disregard of a directive – supervisors tasked with the safety of inmates – would amount to gross negligence and hence personal involvement on the part of these defendants.

C.  DEFENDANTS ACTING COMMISSIONER ANNUCCI AND DEPUTY COMMISSIONER
BELLNIER ARE LIABLE.

In a deposition taken October 25, 2017, Clinton Superintendent Racette stated that from June 6, 2015 on, Acting Commissioner Annucci "took residence in my office" and that he "was not making any decisions from the 6th on."  Exhibit B 57:11-16.  Later, Racette was asked if he was still in charge of the facility, to which he replied "[A]s much as you can be with the Commissioner (Annucci), The Deputy Commissioner (Bellnier), and the Assistant Commissioner sitting there beside you."  Exhibit B 59:12-16.  Clearly, Annucci and Bellnier were present in the facility while the alleged assaults were taking place and they were in charge.

14

For the same reason Judge Sannes denied Racette's motion to dismiss with respect to the assaults occurring immediately after the escape, the motion should be denied as to Annucci and Bellnier. Again, "[g]iven the unusual circumstances following this escape and the widespread allegations of beatings and similar conduct, the Complaint plausibly alleges that Defendant Racette had reason to know of the violations and was grossly negligent or deliberately indifferent in failing to prevent them." Alexander v. Cuomo, 2018 WL 2041576, at 6 (N.D.N.Y., J. Sannes, 2018).

Anthony Annucci is the Acting Commissioner of DOCCS. As such, he is the "chief executive officer" of the department. N.Y. Correct. Law § 5(2). As discussed at length in the complaint and herein, the escape was an extremely high profile event for DOCCS. On June 15, 2015, Governor Cuomo was quoted "capturing these killers and returning them to state custody remains our top priority."[2] His words were echoed by Inspector General Katherine Leahy Scott, who said: "Apprehension of the two fugitives from Clinton Correctional Facility is the highest priority, and nothing will stand in the way of this primary mission."[3] As the CEO of DOCCS, executing the "top priority" of his agency was tasked to Annucci. Defendant Joseph Bellnier was his top deputy. Given the danger the fugitives posed to the general public, and the attention the escape received, it cannot be doubted that Commissioner Annucci was overseeing the investigation of the escape immediately thereafter. As stated above, he and Bellnier were stationed at Clinton C.F. while the interrogation related assaults were occurring.

As such, given the extraordinary circumstance surrounding the escape and his presence in the facility leading the investigation, he knew, or should have known that excessive force was being used on honor block inmates such as Mr. Zenon to extract information from them. He also allowed the policy of using excessive force to find the fugitives to continue, and likely tacitly

---

[2] http://www.mynbc5.com/article/gov-cuomo-calls-for-state-investigation-of-escape-from-clinton-correctional-facility/3324019
[3] Id.

created the policy.  Therefore, the allegations taken as true would result in a finding of liability for failing to supervise under the third and fourth bases for liability under <u>Colon</u> and thus the cause of action should not be dismissed against them.

<u>**CONCLUSION**</u>

New York's Attorney General's office continues to belittle the allegations made by incarcerated people that they were systematically and brutally assaulted in the aftermath of the escape from Clinton C.F. and that DOCCS employees attempted to cover up.  At page 8 of defendants' Memorandum of Law, they sarcastically refer to plaintiff's allegation of being kept incommunicado for 31 days as an alleged "vast cover up scheme."  Of course, plaintiff did not characterize the cover up as "vast" or a "scheme."

The Attorney General uses such language and characterization to make Mr. Zenon's (and allegations of other incarcerated persons who were abused after the escape) seem fabricated.  Of course, you need not take the word of offenders' or plaintiff's lawyers to know there were cover ups.  The New York State Inspector General, another state agency that the Attorney General is obligated to defend, referred 39 Clinton employees to various agencies in connection with the escape and their conduct during the investigation of the escape, mostly for "Official Misconduct" and "False Filing", both are crimes.  Yet, of the 39, 35 remain on the payroll, and one passed away.

The Inspector General stated in its report on the investigation of the escape:

> "The Inspector General is compelled to note that this investigation
> was made more difficult by a lack of full cooperation on the part of
> a number of Clinton staff, including executive management,
> civilian employees, and uniformed officers.  Notwithstanding the
> unprecedented granting of immunity from criminal prosecution for
> most uniformed officers, employees provided testimony under oath
> that was incomplete and at times not credible.  Among other
> claims, they testified they could not recall such information as the

16

names of colleagues with whom they regularly worked,
supervisors, or staff who had trained them.  Several officers,
testifying under oath within several weeks of the event, claimed
not to remember their activities or observations on the night of the
escape.  Other employees claimed ignorance of security lapses that
were longstanding and widely known.

The Inspector General finds these misstatements and purported
lapses of memory reprehensible.  These actions may also violate
state ethics laws and, in the case of uniformed officers, a sworn
duty to uphold the law."[4]

The Inspector General further pointed out in the report that they identified "a number of

employees who committed criminal acts…", but none were prosecuted.[5]

In an investigation of alleged escape related assault of a Clinton inmate, Office of Special

Investigations Investigator Stephen Weishaupt told one of the original investigating sergeants

that his investigation "looked like a cover-up."  He also stated that another sergeant's

investigation of the matter "defied logic".

Plaintiff has no interest in deciding whether this conduct documented by employees of

the State of New York constitutes "vast cover-up schemes" or not, but cover-ups do, clearly

occur.  As opposed to derisive sarcasm, we would hope that the Attorney General's office would

follow a path of just sifting through the fact or fiction of specific inmate allegations.

For all the foregoing reasons, defendants' motion to dismiss should be denied,

---

[4] https://ig.ny.gov/sites/default/files/pdfs/DOCCS%20Clinton%20Report%20FINAL_1.pdf at page 11.
[5] Id. at page 150.

DATED:      New York, NY
            July 26, 2018

                              STOLL, GLICKMAN & BELLINA, LLP


                    BY: _____/S/_____
                              Leo Glickman
                              Attorney for Plaintiff
                              475 Atlantic Ave. 3rd flr.
                              Brooklyn, NY 11217
                              (718)852-3710
                              lglickman@stollglickman.com