UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

LUIS ZENON,

                              Plaintiff,

        -against-                                              9:18-CV-0458 (LEK/ATB)

PATRICK DOWNEY, *et al.*,

                              Defendants.

_____

## DECISION AND ORDER

## I.      INTRODUCTION

Plaintiff Luis Zenon alleges that he was abused by correctional officers and state troopers

after two prisoners escaped from Clinton Correctional Facility in the Village of Dannemora, New

York. Dkt. No. 1 ("Complaint") ¶¶ 1–3. He brings claims for violations of his constitutional

rights under 42 U.S.C. § 1983. Id. ¶¶ 59–115. All Defendants but Correction Officer Patrick

Downey have moved to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure. Dkt. No. 18 ("Motion"). For the reasons that follow, the Motion is granted with

respect to defendants Anthony Annucci and Joseph Belliner and otherwise denied.

## II.     LEGAL STANDARD

Rule 12(b)(6) requires a complaint to be dismissed if it "fail[s] to state a claim on which

relief may be granted." To state a valid claim, a complaint must allege "enough facts to state a

claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570

(2007); Fed. R. Civ. P. 8(a)(2). The Court may disregard "legal conclusions couched as factual

allegations" that are "devoid of further factual enhancement." Ashcroft v. Iqbal, 556 U.S. 662,

678 (2009). However, "[w]hen there are well-pleaded factual allegations," a court must take

them as true, id. at 679, and "draw[] all reasonable inferences in the plaintiff's favor," Harris v.

Mills, 572 F.3d 66, 71 (2d Cir. 2009). To "'nudge[] [the plaintiff's] claims across the line from

conceivable to plausible,'" the facts need only "'raise a reasonable expectation that discovery

will reveal evidence' of the wrongdoing alleged, 'even if it strikes a savvy judge that actual proof

of those facts is improbable.'" Citizens United v. Schneiderman, 882 F.3d 374, 380 (2d Cir.

2018) (quoting Twombly, 550 U.S. at 556–57, 570).

When deciding a motion to dismiss under Rule 12(b)(6), "a district court may consider

the facts alleged in the complaint, documents attached to the complaint as exhibits, and

documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622

F.3d 104, 111 (2d Cir. 2010). It may also consider "documents or information contained in [the]

defendant's motion papers if the plaintiff has knowledge or possession of the material and relied

on it in framing the complaint," as well as "facts of which judicial notice may properly be taken

under Rule 201 of the Federal Rules of Evidence." Envtl. Servs. v. Recycle Green Servs., 7 F.

Supp. 3d 260, 270 (E.D.N.Y. 2014) (quoting In re Merrill Lynch & Co., 273 F. Supp. 2d 351,

356–57 (S.D.N.Y. 2003)).

## III. FACTUAL BACKGROUND

As required, the Court draws the following facts from the Complaint and the documents it

incorporates, and it takes those facts as true. Harris, 572 F.3d at 71.

On June 6, 2015, two inmates—Richard Matt and David Sweat—escaped from the

"honor block" at Clinton. Compl. ¶¶ 2–3. Prisoners gained "honor block" housing as a reward for

good behavior. State of N.Y. Office of the Inspector General, "Investigation of the June 5, 2015

Escape of Inmates David Sweat and Richard Matt from Clinton Correctional Facility," June 2016 ("Inspector General's Report").[1] Inmates on the honor block were subject to the same security measures as other prisoners, but had more privileges, "including longer recreation periods on weekdays and weekends when they were allowed to remain in their cells or congregate on the 'flats,' or open areas . . . where they could cook and engage in recreational and social activities." Compl. ¶ 19. At the time of the escape, Plaintiff had lived on the honor block for seven years, where he worked as a porter. Id. ¶ 28. He slept in a cell near the one occupied by Matt and Sweat and knew them well. Id. ¶ 29.

In the days after the escape, "[d]ozens of inmates who were in the honor block or who worked in the tailor shop were brutally interrogated, beaten, and tortured by prison guards." Id. ¶ 81. "Inmates described a strikingly similar catalog of abuses, including being beaten while handcuffed, choked, and slammed against cell bars and walls." Michael Schwirtz & Michael Winerip, "After 2 Killers Fled, New York Prisoners Say, Beatings Were Next," New York Times, Aug. 11, 2015 ("New York Times Article"); see also Corr. Assoc. of N.Y., "10 Things You Need to Know about Brutality and Abuse at Clinton Correctional Facility," Sept. 4, 2015 ("C.A.N.Y. Report").[2] Inmates reported being interrogated and beaten by correctional officers, including officers wearing jackets labeled "Crisis Intervention Unit." N.Y. Times Article. "In the

---

[1] The Complaint incorporates the Inspector General's Report by reference. Compl. ¶ 53.

[2] The New York Times Article and C.A.N.Y. Report are also incorporated in the Complaint by reference. Id. ¶¶ 6 n.2, 81 n.3. They are available at https://www.nytimes.com/2015/08/12/nyregion/after-2-killers-fled-new-york-prisoners-say-beatings-were-next.html and https://www.correctionalassociation.org/news/10-things-you-need-to-know-about-brutality-and-abuse-at-clinton-c-f (last visited December 19, 2018).

two weeks after the escape, inmates from Clinton's honor block were dispersed, many of them sent to solitary confinement at other prisons" without evidence they were involved in the escape. Id. They were "beaten during their transfers" and shackled so tightly as to cause scars and bruising. Id.

Plaintiff endured a similar ordeal. In the afternoon of June 6, 2015, the day of the escape, Plaintiff was handcuffed and taken from his cell to a room where numerous people— "some . . . in suits, others in Crisis Intervention Unit jackets," and defendant Patrick Downey, a Clinton correctional officer—were waiting. Compl. ¶ 31. There, the officers "aggressively question[ed]" Plaintiff about Matt and Sweat and "choked" him "until he changed color" three times. Id. ¶ 32.

Plaintiff "was [then] locked in his cell until June 9, 2015," when officers took him in his underwear to a room, told him not to speak, shackled him, and put him in a van with two other inmates. Id. ¶¶ 35–36. "[O]fficers were screaming at them to not say a word to one another." Id. By the time he arrived at Great Meadow Correctional Facility, Plaintiff was "in great pain due to the handcuffs being very tight on him." Id. ¶ 37. "After they arrived, he asked an officer to loosen his cuffs because his circulation was cut off," but before anyone did so, he "passed out from the pain and stress." Id. ¶ 38. When he regained consciousness, the officer called Plaintiff a "pussy" and told him to get up, but Plaintiff was too weak to stand. Id. ¶ 39. "The officer then kicked him in the face and took the handcuffs off." Id. While being escorted to his cell at Great Meadow, Plaintiff was also "punched in the stomach numerous times." Id. ¶ 40.

Plaintiff was placed in solitary confinement in the Segregated Housing Unit ("SHU") at Great Meadow. Id. ¶ 40. Two days later, another prisoner called Plaintiff's wife to tell her Plaintiff was in the SHU. Id. ¶ 41. Later, "a sergeant came to him and said that if [your] family

4

calls again, you're not going to like what happens, then elaborat[ed]" that Plaintiff "belonged . . . to Clinton." Id. For thirty-one days, Plaintiff was forced to spend twenty-four hours per day in his small cell in the same clothes without any of his personal belongings, and was forbidden from speaking with anyone, including doctors and his family. Id. ¶¶ 44–49. He was never given an opportunity for a hearing or any other means to challenge his confinement. Id. ¶ 48. Plaintiff asserts that he "and many others were placed in [the] SHU to cover up the crimes of correction officers" by ensuring that their victims "were isolated from the outside world" and could not contact lawyers, family, or doctors to complain. Id. ¶ 50.

Plaintiff has sued Downey, a number of John Doe State Troopers and Correction Officers, and multiple John Doe Supervisors at Clinton and Great Meadow. Id. ¶¶ 26–27. He has also named as defendants Anthony Annucci and Joseph Belliner, the Acting Commissioner and Deputy Commissioner for Correctional Facility Operations, respectively, of the New York Department of Correction and Community Supervision ("DOCCS"). Id. ¶ 17. Finally, he names as defendants Clinton Superintendent Steven Racette, First Deputy Superintendent Donald Quinn, and Deputy Superintendent for Security Stephen Brown (collectively, the "Clinton Supervisors"); and Great Meadow Superintendent Christopher Miller, First Deputy Superintendent Matthew Thoms, Deputy Superintendent for Security Rodney Eastman, and Sergeant Francis Scarlotta, who manages the SHU (the "Great Meadow Supervisors"). Plaintiff alleges that Defendants—either directly or by managing their subordinates—violated his Eighth and Fourteenth Amendment rights against cruel and unusual punishment and the deprivation of liberty without due process of law.

Downey has answered the Complaint. Dkt. No. 19 ("Downey Answer"). Annucci,

Belliner, and the Clinton and Great Meadow Supervisors have moved to dismiss. Mot.[3]

## IV.  DISCUSSION

Section 1983 provides a right to sue for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. Though "Section 1983 itself creates no substantive rights," it provides "a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993). To state a valid claim under it, a plaintiff must allege that (1) a person acting under color of state law (2) deprived the plaintiff of a right guaranteed under the Constitution or a federal statute. Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010).

Defendants do not contest that, if it happened, the alleged June 6, 2015 beating and interrogation of Plaintiff at Clinton would entitle him to relief from the officers directly involved the incident under the Eighth and Fourteenth Amendments. However, they argue that Plaintiff's solitary confinement at Great Meadow without a hearing did not violate due process or constitute cruel and unusual punishment. They also argue that the Complaint lacks allegations suggesting that any of them were personally involved in the beatings or in setting the conditions of Plaintiff's solitary confinement. Except with respect to Annucci and Belliner, the Court disagrees.

### A.  Denial of Due Process

To successfully state a claim under § 1983 for denial of due process, a plaintiff must adequately plead (1) that he possessed a liberty interest and (2) that the defendants deprived him

---

[3] From this point onward, for ease of reference, the Court will use the term "Defendants" to mean only the defendants that joined in the Motion, unless otherwise specified.

of that interest without a fair process, which must include adequate notice and an opportunity to be heard. Ortiz v. McBride, 380 F.3d 649, 654 (2d Cir. 2004). Segregated confinement deprives a state prisoner of "liberty" when it (a) imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," Sandin v. Conner, 515 U.S. 472, 484 (1995), and (b) the "state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint," Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir. 1996). State statutes and regulations satisfy prong (b) if they "require, in language of an unmistakably mandatory character, that a prisoner not suffer a particular deprivation absent specified predicates." Tellier v. Fields, 280 F.3d 69, 81 (2d Cir. 2000).

As a threshold matter, Defendants argue that New York regulations—which authorize transfer to an SHU for "administrative," "protective," or "any other reason," 7 N.Y.C.R.R. § 301.7(a)—do not create a liberty interest in remaining free of the SHU because they do not sufficiently limit official discretion to confine inmates for such non-disciplinary reasons. See Defs.' Mem. at 7. New York state officials made the same argument twenty years ago in Lee v. Coughlin. 26 F. Supp. 2d 615, 631 (S.D.N.Y. 1998) ("First, the defendants argue, New York State regulations do not create a liberty interest in remaining free from SHU, and instead the State retains the discretion to place inmates in SHU for any reason."). Then-Judge Sotomayor rejected it, recognizing that the Second Circuit has "long recognized that [New York] statutes and regulations limited the discretion of prison officials in placing inmates in restrictive confinement, SHU or administrative, thereby creating a liberty interest." Id. (citing Wright v. Smith, 21 F.3d 496, 499 (2d Cir. 1994), among other cases). Indeed,"New York prison officials themselves recognize[d] the limited nature of their discretion in that the 'catchall' provision of

7

New York regulations that permits placement in SHU 'for any other reason' is used only in 'emergency or unusual situations,'" and in fact, "New York regulations limit the exercise of . . . discretion in placing prisoners in both punitive and non-punitive confinement." Id. at 633. Thus, New York regulations purport to create a liberty interest that is deprived through SHU confinement. Sandin did not alter this conclusion. Id.

Rather, "[t]he issue that Sandin . . . create[d] is whether [SHU] confinement imposes an atypical and significant hardship on the inmates in relation to the ordinary incidents of prison life." Lee, 26 F. Supp. at 631, meaning "a dramatic departure from the basic conditions" of the plaintiff inmate's sentence, Sandin, 515 U.S. at 484. If DOCCS regularly imposes hardships of comparable severity and duration on other prisoners, such that they are to be expected as part of the plaintiff's criminal sentence, then freedom from such conditions "is not a right of 'real substance'" which the federal constitution "protects." Welch v. Bartlett, 196 F.3d 389, 393 (2d Cir. 1999). Thus, the Court must compare the nature and duration of Plaintiff's confinement to the conditions in the general population and in routine administrative or protective confinement. Id.

The Second Circuit has established guidelines for how long a prisoner must be confined under "standard SHU conditions"—which include confinement alone in a cell for twenty-three hours per day, exercise in a yard for one hour per day, two showers per week, inability to work or study, and fewer family visits than are allowed in the general population—to implicate a liberty interest. Colon v. Howard, 215 F.3d 227, 231 (2d Cir. 2000). In Colon, the court held that 305 days of such confinement is longer than "periods of comparable deprivation typically endured by other prisoners in the ordinary course of prison administration" and requires due process

8

protections. Id. In Sealy v. Giltner, in contrast, it held (on a limited record) that the plaintiff had

not shown that 101 days of standard SHU confinement was "atypical." 197 F.3d 578, 589–90 (2d

Cir. 1999).

Nevertheless, "SHU confinements of fewer than 101 days could constitute atypical and

significant hardships if the conditions were more severe than the normal SHU conditions of

Sealey or a more fully developed record showed that even relatively brief confinements under

normal SHU conditions were, in fact, atypical." Palmer v. Richards, 364 F.3d 60, 65 (2d Cir.

2004). In other words, even when the duration of a prisoner's solitary confinement is not long

enough to constitute a deprivation of "real substance," the attendant conditions of such may

nonetheless make it sufficiently atypical and significant to implicate a liberty interest. Id. at 66.

Thus, in Palmer, the Court denied the defendant prison officials' motion for summary judgment

because even though the plaintiff inmate was confined in the SHU for only seventy-seven days,

he was deprived of his personal effects, including hygienic products, personal clothing and food,

family pictures, and reading and writing materials, and was kept completely "out of

communication from his family." Id. The court found that, "at least based on the record as it

stands now, [plaintiff] should have the opportunity to demonstrate that the conditions of his

confinement vis-a-vis both the conditions in administrative confinement and in the general prison

population were sufficiently harsh to violate a liberty interest despite the 'comparative shortness'

of his confinement." Palmer, 364 F.3d at 66; see also Davis v. Barrett, 576 F.3d 129, 134

(holding that a more detailed factual record was required to determine whether unsanitary

conditions of 41-day administrative confinement, in which plaintiff was denied books,

commissary privileges, and his one hour of exercise per day, entitled plaintiff to due process).

Although the duration of Plaintiff's confinement in the SHU—thirty-one days—is shorter than the seventy-seven days in Palmer and forty-one days in Davis, the Second Circuit was in those cases considering whether the plaintiff had developed enough evidence in discovery to prove that the conditions in solitary were sufficiently extraordinary to prove a constitutional violation at trial. To survive a pre-discovery motion to dismiss, however, Plaintiff need only demonstrate "a reasonable expectation that discovery will reveal evidence" of such a violation. Twombly, 550 U.S. at 556–57. And if Plaintiff's allegations are true, the conditions of his solitary confinement were even more severe than in Palmer. Defendants severely abused him on his way to the SHU, where he was locked up for twenty-four hours per day without contact with his family or medical attention for one month. Compl. ¶¶ 35–50. In addition, unlike Palmer, who was sentenced to a definite term in the SHU, Plaintiff could see no light at the end of the tunnel; no one told him whether or when he would be released from solitary. These conditions not only deviated from prior judicial findings describing "standard SHU conditions," Colon, 215 F.3d at 231, but also violated multiple DOCCS regulations.[4] Therefore, it is plausible that the conditions alleged in the Complaint were a "dramatic departure from the basic conditions" prisoners endure in the general population or during routine administrative segregation. Sandin, 515 U.S. at 484, 486; Palmer, 364 F.3d at 66; Davis, 576 F.3d at 134.

---

[4] See, e.g., N.Y.C.R.R.§§ 304.3 ("Inmates confined in the SHU must be permitted one hour of outdoor exercise daily, exclusive of the time it takes to go to and return from the exercise area, beginning on the day following admission."), 304.4 (requiring "[a] qualified medical practitioner . . . to examine each inmate upon admission to an SHU" and to "visit the SHU once in every 24-hour period to examine into the state of health of the inmates confined in such unit," and providing that "[a]ny inmate who requests to see a medical practitioner will be permitted an opportunity to do so in accord with all good security precautions"), 304.12 (requiring that two books and one magazine be available to each inmate), 304.13 ("Each inmate shall be permitted to send and to receive privileged and regular correspondence.").

Because Plaintiff had a liberty interest in not being confined for thirty-one days under such conditions, he was entitled to adequate notice of the reasons for confinement and "an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation" within "a reasonable time following [his] transfer." Wright, 21 F.3d at 499–500. The Complaint states that Plaintiff was given no such notice or hearing. Compl. ¶ 48. Accordingly, it states a plausible claim that Plaintiff's SHU confinement violated the Fourteenth Amendment.

## B. Cruel and Unusual Punishment

The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. State officials violate it if they "wantonly" inflict unnecessary pain on a prisoner. Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013). An Eighth Amendment claim has two elements: one objective—the defendant must inflict a sufficiently serious harm—and the other subjective—he or she must inflict it with a culpable mental state. Crawford v. Cuomo, 796 F.3d 252, 256 (2d Cir. 2015). Adverse conditions of confinement are sufficiently serious if they "pose an unreasonable risk of serious damage to [an inmate's] health" or deprive him of "'basic human needs' such as food, clothing, medical care, and safe and sanitary living conditions." Walker, 717 F.3d at 125. "[C]onditions of confinement may be aggregated to rise to the level of a constitutional violation, but 'only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.'" Id. Extreme temperatures, egregiously unsanitary conditions, prolonged sleep deprivation, or a "substantial risk of serious harm from other inmates" can constitute unconstitutional conditions of confinement. Id. at 126–28. "A prison official has sufficient culpable intent" if he is "deliberately

11

indifferent" to such conditions, meaning that "he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." Hayes v. N.Y.C. Dep't of Corrs., 84 F.3d 614, 620 (2d Cir. 1996); see also Farmer v. Brennan, 511 U.S. 825, 837 (1994) (stating that "deliberate indifference" equates to "criminal recklessness," which requires "more than mere negligence" but "less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result").

When using force against a prisoner, guards must "appl[y] [it] in a good-faith effort to maintain or restore discipline," to serve a legitimate penological objective, and not "maliciously and sadistically to cause harm." Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (quoting Hudson v. McMillian, 503 U.S. 1, 7 (1992)). To be excessive, force need not cause significant injury. Id. That said, "[n]ot every push or shove . . . violates a prisoner's constitutional rights." Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973). To determine whether the defendants "maliciously" inflicted "unnecessary" pain, the Court must consider the degree of force used, any injuries to the prisoner, any "threat reasonably perceived by the responsible officials," and "any efforts made by the defendants to temper the severity of a forceful response" to determine whether the defendants "maliciously" inflicted "unnecessary" pain. Id. (citing Hudson, 503 U.S. at 6–7). However, when an officer uses unconstitutionally excessive force, the deliberate indifference of fellow officers—knowing the excessive force would be used and refusing to take reasonable steps to stop it—makes them liable, too. Clark v. Gardner, 256 F. Supp. 3d 154, 167 (N.D.N.Y. 2017).

Arguing that the conditions of Plaintiff's solitary confinement were not severe enough to violate the Eighth Amendment, Defendants focus on Plaintiff's allegations that "he was denied personal belongings, a change of clothes, writing materials, grievance forms, and phone calls,"

Defs.' Mem. at 9. "[R]estrictions on telephone use, recreational activities, visitation, and personal property . . . are a generally accepted aspect of SHU confinement." Id. (citing Green v. Cent. Off. Review Comm., No. 06-CV-6312, 2012 WL 1191596, at *5 (W.D.N.Y. Apr. 9, 2012)). Imposed for a short period, those restrictions alone would not satisfy the Eighth Amendment's objective element. Id.; see also Dixon v. Goord, 224 F. Supp. 2d 739, 748 (S.D.N.Y. 2002) ("[A]llegations of having been cut off from the prison population, a computer program, religious services, legal research, medical showers and personal property, as well as limits on food access, *and other normal incidents of SHU confinement*, are not violations of the Eighth Amendment.") (emphasis added).

However, the Complaint alleges that Plaintiff endured more than the ordinary strictures of SHU confinement described in Green or Dixon. First, the guards choked Plaintiff, beat him, fastened his handcuffs into a tourniquet, ignored his pleas to loosen them, and beat him again without any legitimate penological purpose. Compl. ¶ 32, 37–39. These actions alone constituted the "wanton" infliction of "unnecessary pain" sufficient to violate the Eighth Amendment. See Meriwether v. Coughlin, 879 F.2d 1037, 1047 (2d Cir. 1989) (finding "that there was sufficient evidence of excessive force" where "the plaintiffs testified that were assaulted by guards, and there was no evidence that any physical abuse was necessary to transfer the plaintiffs"). Then, in addition to denying him books and personal property, Great Meadow officials kept him incommunicado for thirty-one days, isolating him from family and mental health staff while he recovered from the physical and psychological trauma inflicted by his custodians.[5]

---

[5] Defendants also cite Coffeey v. Hollenback No. 14-CV-196, 2016 WL 770087 (N.D.N.Y. Jan. 27 2016). However, the duration of confinement, among other things, distinguishes Plaintiff's solitary confinement from the plaintiff's in Coffeey, which lasted only

Compl. ¶¶ 42–49. They did so not for any legitimate penological reason, but to stifle reports of

abuses committed by Clinton correction officers. Id. ¶ 50. It is plausible, therefore, that Plaintiff's

incommunicado, constant confinement rendered his ordeal all the more "incompatible with the

evolving standards of decency that mark the progress of a maturing society," Hudson, 503 U.S. at

10–11, because it materially exacerbated his already severe psychological trauma for no

legitimate reason. See Delaney v. DeTella, 256 F.3d 679, 684–85 (7th Cir. 2001) (explaining that

prolonged isolation in solitary confinement can cause "substantial psychological damage" which,

when imposed without "any legitimate penological need," violates the Eighth Amendment).

Accordingly, it is plausible that the guards who attacked Plaintiff, placed him in the SHU, and

maintained his abnormally seclusive conditions of solitary confinement wantonly inflicted

unnecessary pain and, therefore, violated the Eighth Amendment.

### C. Supervisor Liability

However, the fact that line officers directly involved in Plaintiff's abuse violated the

Constitution does not mean their supervisors may be held liable under § 1983. Section 1983 does

not impose "respondeat superior" liability; a supervisor may not be held liable for damages for

constitutional violations merely because he had authority over the wrongdoers. Iqbal, 556 U.S. at

676. "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that

each Government-official defendant, through the official's own individual actions, has violated

the Constitution." Id. In Colon v. Coughlin, the Second Circuit held that:

> the personal involvement of a supervisory defendant may be shown by evidence that
> (1) the defendant participated directly in the alleged constitutional violation, (2) the
> defendant, after being informed of the violation through a report or appeal, failed to

six days. Id. at *6.

remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

58 F.3d 865, 873 (2d Cir. 1995). Thus, "Colon permitted supervisory liability in situations where the supervisor knew of and acquiesced in a constitutional violation committed by a subordinate." Sash v. United States, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009).

After the Supreme Court's later decision in Iqbal, 556 U.S. at 676–77, 682 (holding that supervisors' "knowledge and acquiescence" in the discriminatory purpose behind their subordinate's actions was insufficient to violate the Equal Protection Clause, and requiring plaintiffs to plead facts showing that supervisors "purposefully adopted" a discriminatory policy), some courts in the Second Circuit held that constitutional claims against supervisory officials may no longer be "based on [a defendant's] failure to take corrective measures," and that § 1983 "imposes liability only where that supervisor directly participated in the alleged violation or had a hand in creating a policy or custom under which the unconstitutional practices occurred." Sash, 674 F. Supp. 2d at 543–44. Therefore, they concluded that "only the first and part of the third Colon categories [would] pass Iqbal's muster." Id.

In Turkmen v. Hasty, however, the Second Circuit clarified that Iqbal, properly read, teaches merely that supervisory officers are liable when, "through their own actions, they satisfy each element of the underlying constitutional tort." 789 F.3d 218, 250 (2d Cir. 2015), rev'd on other grounds, Ziglar v. Abbasi, 137 S. Ct. 1843 (2017). Therefore, "Iqbal does not preclude . . . claims [against government officers] premised on deliberate indifference," as opposed to a

purposefully illegal policy or practice, "when the underlying constitutional violation requires no

more than deliberate indifference." Id. Therefore, a supervisory official violates both the Eighth

and Fourteenth Amendments when he or she acts with "deliberate indifference" to the facts that

his subordinates are unnecessarily abusing prisoners, id. at 150–51 (finding allegations that a

prison's warden knew about widespread detainee abuse, but permitted it to continue, sufficed to

state a claim under the Eighth Amendment), and taking their liberty without due process, Newton

v. City of New York, 779 F.3d 140, 156 (2d Cir. 2015) ("A state prison guard's deliberate

indifference to the consequences of his conduct for those under his control and dependent upon

him may [also] support a claim [for a violation of the Fourteenth Amendment Due Process

Clause] under § 1983.").

Like a line officer, a supervisor acts with the requisite deliberate indifference if he or she

"knew of and acquiesced in [the] constitutional violation." Sash, 674 F. Supp. 2d at 54.[6]

"Evidence that a risk was obvious or otherwise must have been known to a defendant may be

sufficient for a fact finder to conclude that the defendant was actually aware of the risk." Walker,

717 F.3d at 125. In addition, a supervisor's wilful blindness will not protect him. If a defendant

"merely refused to verify underlying facts that he strongly suspected to be true, or declined to

---

[6] Sash was an Eighth Amendment case. In Darnell v. Pineiro, the Second Circuit held that "deliberate indifference" has different meanings in the Fourteenth and Eighth Amendment contexts. 849 F.3d 17, 35 (2d Cir. 2017). Under the Eighth Amendment, as indicated earlier, "deliberate indifference" is a two-pronged, objective *and* subjective standard, meaning that the risk of harm to the inmate must be sufficiently serious *and* the official must actually know of and disregard it. Id. at 32. But to violate the Due Process Clause of the Fourteenth Amendment, the official need only "fail[] to act with reasonable care to mitigate the risk that [a] condition posed to the [inmate] even though the defendant-official knew, *or should have known*, that the condition posed an excessive risk to health or safety." Id. at 35 (emphasis added). In any event, since Defendants' conduct plausibly satisfies the more stringent Eighth Amendment standard, the distinction between the two standards is immaterial at this stage.

16

confirm inferences of risk that he strongly suspected to exist (as when a prison official is aware

of a high probability of facts indicating that one prisoner has planned an attack on another but

resists opportunities to obtain final confirmation)," he was deliberately indifferent to that risk.

Farmer, 511 U.S. at 862 n.8.

The Complaint plausibly alleges that the Clinton Supervisors consciously disregarded a

high risk that their subordinates would harm Plaintiff. Colon, 58 F.3d at 873. Matt and Sweat's

high-profile escape, for which Clinton's leadership was ultimately accountable, drew the

attention of the national media, the public, and the New York Governor's office, and placed

urgent demands on the Clinton Supervisors to prioritize the investigation and follow it closely.

Compl. ¶¶ 79–82, 106; N.Y. Times Art. The "catalogue of abuses" described by honor block

inmates was "strikingly similar:" officers repeatedly beat and suffocated them during

interrogations then transferred them to other prisons to be locked incommunicado in solitary

confinement. N.Y. Times Art.; see also Compl. ¶¶ 6, 32, 50, 81; C.A.N.Y. Rep. ¶¶ 1, 5, 7. These

patterns suggest coordination not only among the Jon Doe correction officers and troopers

perpetrating the abuses (who worked for multiple different agencies), but also with supervisory

officials who directed the investigation and were in a position to authorize prisoner transfers. It is

plausible to infer that such widespread, coordinated abuses during the likely closely-monitored

investigation could not have happened without the Clinton Supervisors' knowing acquiesce, or

wilful blindness. See Alexander v. Cuomo, No. 17-CV-309, 2018 WL 2041576, at *6 (N.D.N.Y.

Feb. 26, 2018) (finding that similar allegations by other Clinton inmates were sufficient to state a

claim that superintendent Racette was deliberately indifferent to the beatings after Matt and

Sweat's escape). Moreover, Plaintiff plausibly states that the Clinton Supervisors must have

known Plaintiff, who bunked near Matt and Sweat and knew them well, was especially

susceptible to violent interrogation or retaliation by guards in the wake of the escape. Compl. ¶¶

29, 84; Farmer, 511 U.S. at 482 (noting that evidence that defendant knew of victim's special

vulnerability to abuse may support an inference of deliberate indifference). Therefore, the claims

against the Clinton Supervisors survive.

The Great Meadow Supervisors—one step removed from the closely-watched

investigation and prolific abuses at Clinton—present a closer question. Nevertheless, there was

also a pattern in the conditions imposed exclusively on honor block inmates who were

transferred to Great Meadow: unlike other SHU inmates, they were beaten in transit and locked

up without their personal property or access to professionals or family who could address their

injuries or hear their stories. Compl. ¶¶ 50, 108; N.Y. Times Art.; C.A.N.Y. Rep. ¶ 7. That

consistency in treatment implies both (1) that the subordinate officers coordinated amonst

themselves to maintain report-suppressing conditions of confinement; and (2) that the Great

Meadow Supervisors must have either knowingly cooperated or been wilfully blind to such wide-

reaching and coordinated behavior. As such, at this early stage, it would be inappropriate to

dismiss the claims against them.

However, Plaintiff does not provide enough facts from which to infer that Commissioner

Annucci and Deputy Commissioner Belliner, both executive officers who supervised the

numerous prisons in New York State, ordered the abuses at Clinton or Great Meadow or knew or

(with respect to the due process violations) should have known about them in time to prevent

them. Although Plaintiff alleges in general terms that he "made numerous complaints to various

prison authorities and to other officials explaining that his safety and security were in serious

18

jeopardy [at Clinton] because of threats and harassment by correction officers in connection with the investigations of the escape," Compl. ¶ 80, and "made complaints to various prison authorities and to other officials in connection with the living the conditions in the SHU," id. ¶ 107, Plaintiff gives no reason to believe that his complaints ever reached Annucci or Belliner's offices, or that either executive knew how the investigation into the Clinton escape was being conducted on the ground. As a result, the district court in Alexander held that the similar allegations in that case failed to suggest that Annucci was personally involved in the alleged abuse. 2018 WL 2041576, *5. This Court agrees.[7]

## V.   CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Motion to Dismiss (Dkt. No. 18) is **GRANTED** with respect to the claims against Annucci and Belliner and **DENIED** in all other respects. The claims against Annucci and Belliner are **DISMISSED** without prejudice.

**IT IS SO ORDERED.**

---

[7] In his Opposition to the Motion, Plaintiff quotes Clinton Superintendent Racette's testimony, in his June 6, 2015 deposition for this case, that Acting Commissioner Annucci "took residence in [Racette's] office" and that Racette "was not making any decisions from the 6th [of June] on" because Annucci and Belliner were present in the facility and effectively in charge of the investigation. Dkt. No. 22 ("Opposition") at 14. However, those facts are not in the Complaint, its attachments, or its references. "[A] non-moving party cannot overcome a motion to dismiss simply by asserting new facts or theories for the first time in its opposition." Nicosia v. Town of Hempstead, No. 16-CV-1176, 2017 WL 9485669, at *5 (E.D.N.Y. June 14, 2017), adopted, No. 16-CV-1176, 2017 WL 3769246 (E.D.N.Y. Aug. 28, 2017); see also K.D. ex rel. Duncan v. White Plains Sch. Dist., 921 F. Supp. 2d 197, 209 (S.D.N.Y. 2013) ("Plaintiffs cannot amend their complaint by asserting new facts or theories for the first time in opposition to Defendants' motion to dismiss."). Therefore, the Court cannot consider those new allegations in deciding the Motion.

DATED:      December 20, 2018
               Albany, New York

Lawrence E. Kahn
U.S. District Judge